*An appropriate order will be issued and decision will be entered under Rule 155.*

GULF OIL CORPORATION, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 22499-82.      Filed August 26, 1986.

*J. Waddy Bullion, Emily A. Parker, Sean T. Crimmins, Buford P. Berry, J.Y. Robb III,* and *Margaret S. Alford,* for the petitioner.

*Joel V. Williamson* and *Joseph R. Goeke,* for the respondent.

GOFFE, *Judge*: The Commissioner determined deficiencies in petitioner's Federal income tax for the taxable year 1974 in the amount of $80,813,428 and for the taxable year 1975 in the amount of $166,316,320. Petitioner and respondent, by motion granted on November 10, 1983, agreed that certain issues would be severed and tried at a special trial session, which was held at Dallas, Texas.

One of the group of issues tried was designated by the parties as "Constructive Dividends and Payables." This group requires the resolution of three issues: (1) Did the retroactive adjustment of marine charter hire rates between two subsidiaries of Gulf result in a constructive dividend to Gulf; (2) did the diversion of a portion of the profit from the sale of an oil tanker ship by one subsidiary to another subsidiary by means of an increase in the marine freight rate charged by the second subsidiary to the buyer of the tanker result in a constructive dividend to Gulf; and (3) do the uncollected balances owed by Gulf to two of its foreign subsidiaries at the end of the taxable year 1974 constitute investment in U.S. property within the meaning of section 956,[1] resulting in dividend income to petitioner?

## FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation of facts and accompanying exhibits are so found and incorporated by this reference.

Gulf Oil Corp. (hereinafter referred to as petitioner or Gulf) is a corporation organized under the laws of the Commonwealth of Pennsylvania with its principal office in Pittsburgh, Pennsylvania. During the taxable years at issue, Gulf and certain of its subsidiary corporations constituted an "affiliated group" as that term is defined in section 1504. Petitioner, directly and through its foreign subsidiaries and affiliates, is engaged in world-wide exploration, development, production, purchase, transportation, and marketing of petroleum products. Petitioner maintained its books of account for the taxable years in issue on the accrual method of accounting using the calendar year as its

---

[1]Unless otherwise noted, all section references are to the Internal Revenue Code of 1954 as amended and in effect during the taxable years in issue, and all Rule references are to this Court's Rules of Practice and Procedure.

taxable year. Gulf, as the common parent of an affiliated group of corporations, timely filed consolidated Federal income tax returns for its taxable years 1974 and 1975 on behalf of itself, and certain of its subsidiary corporations, with the Office of the Internal Revenue Service at Pittsburgh, Pennsylvania.

For convenience, we will set forth separate findings of fact for each of the three issues addressed in this opinion.

### Adjustment of Freight Rates
### Between Afran and Gulftankers

There are generally three types of chartering arrangements common in the marine transportation industry: bare boat charters, voyage charters, and time charters. Under a bare boat charter the vessel and the equipment necessary to make it seaworthy are delivered to the charterer in "bare" condition. The charterer must bear the costs of crew and supplies plus all voyage costs, which include the cost of fuel and port charges. Under a voyage charter the owner bears all capital, operating, and voyage costs and the charterer simply pays a single charge for the use of the vessel. Under a typical time charter the charterer, who must pay all voyage costs in addition to the charter rate, has use of the vessel for a period of time. The charter rate is quoted as a dollar figure per dead weight ton of the vessel per month.

A charter can be set between the parties for any length of time. Charters are generally classified as either long-term, short-term, or spot charters. A short-term charter is in effect for up to 2 years; a charter for a period of more than 2 years is considered to be long-term. A spot charter lasts only for the length of time it takes for the vessel to complete a specific voyage or voyages.

To assist in the communication and comparison of worldwide charter rates, the marine transportation industry developed the worldscale rate index approximately 25 years ago. Each worldscale rate is calculated by assuming a standard vessel and calculating all of the costs of that vessel for each route over which tankers operate in the world. The worldscale rates are adjusted semiannually by a group of London and U.S. tanker brokers to reflect current costs. To illustrate the usefulness of the worldscale rate

index, assume a charterer desired to charter a tanker from Puerto La Cruz, Venezuela, to Philadelphia and was quoted a rate of "Worldscale 50," a shorthand expression meaning 50 percent of the worldscale rate. In order to determine the actual cost of the charter, the charterer would consult the worldscale rate schedule. If the worldscale rate for this voyage was $4 per ton of cargo carried, expressed as 100 on the worldscale index, the charterer would know the rate he was being quoted was $2 per ton of cargo.

To further assist in the comparison of marine freight rates, the Average Freight Rate Assessment (AFRA) was developed. AFRA is a calculation by a group of London tanker brokers of actual average freight rates on a monthly basis. Stated in terms of worldscale index rates, AFRA is a composite figure that represents the weighted average rate of all charters currently in effect including long-term, short-term, and spot charters. AFRA is calculated separately for six size classes of vessels.

Both the worldscale rate and AFRA indices have become accepted tools in the industry. While the worldscale rate reflects an estimate of the costs of operating a vessel on a specified voyage, AFRA represents actual current charter rates. However, because the worldscale rate and AFRA reflect the cost of shipping one ton of freight, the indices must be converted into a dollar figure per dead weight ton of vessel so that they may be used to quote time charter rates. Furthermore, because both AFRA and worldscale rates include all costs of moving freight, voyage costs, including fuel and port charges, must be subtracted from these rates to approximate the appropriate rate for a time charter of a vessel.

During the taxable year 1974, Gulftankers, a Liberian corporation, and Afran, also a Liberian corporation, were both wholly owned subsidiaries of petitioner. During the taxable years in issue, Gulftankers and Afran were engaged in the marine transportation business. Afran owned, but did not operate, much of petitioner's oil tanker fleet. During the taxable years in issue, Afran was engaged in the business of time chartering tankers exclusively to Gulftankers, which operated the tanker fleet. Gulftankers, in turn, transported oil world-wide on behalf of Gulf subsidiaries and affiliates.

However, as much as 25 percent of the gross income of Gulftankers was generated by spot chartering surplus vessels to unrelated parties.

From 1971 through the taxable years in issue, Afran chartered vessels to Gulftankers by way of consecutive 1-year time charter agreements. These agreements required the payment by Gulftankers of arm's-length time charter rates for each vessel. The rates were established at the beginning of the year based upon an analysis of short-term time charter rates being charged at that time.

To arrive at the arm's-length figure for charter hire rates between Afran and Gulftankers, the assistant comptroller of worldwide marine transportation for Gulf wrote to the director of the foreign flag chartering department for Gulf at the beginning of each year requesting current worldscale rates for the vessels under charter to Gulftankers. After receiving this information, the comptroller's office converted the worldscale rates into time charter rates for use in assessing intercompany charges against Gulftankers on behalf of Afran.

In 1975, Afran had 17 vessels under charter to Gulftankers. In early 1975, Chester Nowak of Gulf's comptroller's office wrote to W.R. Shaunessy of Gulf's chartering department requesting information to make the intercompany charter charges between Afran and Gulftankers. By letter dated February 7, 1975, Shaunessy provided an estimate of 1975 arm's-length charter rates for the vessels owned by Afran that were chartered to Gulftankers. The rates supplied by Shaunessy were based upon worldscale rates reported for the last quarter of 1974 and upon his informal discussions with unrelated tanker brokers, and reflected a projection of arm's-length rates for 1975. This information was used by the comptroller's office to establish the intercompany charter charges for 1975.

During 1975, but after the charter hire rates between Afran and Gulftankers were set, the world-wide demand for tankers declined severely with the result that charter hire rates dropped substantially. The drop in charter hire rates was reflected in concommitant declines in the worldscale rates and AFRA indices. Because the spot charter rates are

more volatile than short- and long-term time charters, the drop in the spot charter rates was dramatic.

The Tax Reduction Act of 1975, Pub. L. 94-12, 89 Stat. 26, made several changes in subchapter N, part III, subpart F, Controlled Foreign Corporations, of the Internal Revenue Code (hereinafter referred to as subpart F) regarding the taxation of controlled foreign corporations effective for taxable years beginning after December 31, 1975. Confronted with these changes, Gulf decided that the structure of its foreign shipping operations around several foreign subsidiaries would become disadvantageous after 1975. Therefore, Gulf decided to transfer to Afran all of the assets of Gulftankers, including the time charter agreements between Afran and Gulftankers. Gulftankers was then liquidated into Gulf effective December 29, 1975. Gulftankers' preliquidation balance sheet as of December 29, 1975, reflected a receivable from Afran arising out of the transfer of its assets in the amount of $74,768,947.

On January 13, 1976, before the books of Gulftankers were closed for the taxable year 1975, F. Leo Faust, Jr., of Gulf's tax department instructed Chester Nowak of the comptroller's office to adjust the charter hire rates between Afran and Gulftankers retroactively for the taxable year 1975. The charter rates were adjusted to an amount calculated by a composite of 75 percent of the average spot charter rate for most of 1975, obtained from an industry publication, and 25 percent of the full composite AFRA rates for 1975. The combination of spot and AFRA, like the rate determined at the beginning of 1975, had to be adjusted to eliminate voyage costs and converted to a per-dead-weight-ton figure for use as a charter rate. Heavily weighting the volatile spot component of the composite adjustment factor caused a substantial reduction in the charter rates used between Afran and Gulftankers. In one instance, the comptroller's department had to increase the figure used for the spot component of the adjustment because adjusting based upon actual spot would have resulted in a negative charter rate. This adjustment reduced the 1-year charter rate between Afran and Gulftankers in the total amount of $8,805,000. The adjustment in charter hire rates had the effect of increasing the receivable from Afran on Gulftank-

ers' preliquidation balance sheet by $8,805,000. The Gulftankers' receivable from Afran, which was held by Gulf after the liquidation of Gulftankers, was satisfied in full in March 1976.

The adjustment made on January 13, 1976, was the first such retroactive adjustment made to the charter rates between Afran and Gulftankers since they first entered into 1-year time charter agreements in 1971. The director of foreign flag chartering was not contacted concerning the decision to adjust the charter hire rates between Afran and Gulftankers. Such an adjustment of short-term time charter was virtually unknown in the industry and only occurred in the event of hardship to one of the parties to a time charter agreement. Furthermore, the use of a composite of AFRA and spot rates was not a methodology used in the industry to set time charter rates.

For the taxable year 1975, the Commissioner determined that Gulf realized a constructive dividend from Afran in the amount of $7,247,000 based upon the downward adjustment of the charter rates charged by Afran to Gulftankers under the 1-year time charter in effect for that year. As of December 31, 1975, the current or accumulated earnings and profits of Afran equaled or exceeded the amount determined by the Commissioner to be a constructive dividend distribution.

### Sale of La Santa Maria

By agreement dated November 22, 1969, between Gulf and Astilleros y Talleres del Noroeste, S.A. (Astano), an unrelated Spanish shipbuilding corporation, Astano agreed to construct an oil tanker of approximately 324,000 dead weight tons, which was later named La Santa Maria. Because La Santa Maria was to operate as a Spanish-flag vessel, Gulf at all times intended to transfer ownership of La Santa Maria to a Spanish corporation, Compania Maritima Rio Gulf, S.A. (Maritima). Gulf indirectly owned 39.7 percent of Maritima through Transocean Gulf Oil Co. (Transocean), a wholly owned Delaware subsidiary, and the remaining 60.3 percent indirectly through other subsidiaries. Gulf was a party to the construction contract only because Astano so insisted.

Maritima and Gulf arranged for initial long-term financing of up to $35 million to pay for *La Santa Maria* from three French banks, Banque WORMS, Banque de l'Indochine, and Credit Industriel et Commercial. Financing was arranged through the French banks to take advantage of favorable interest withholding provisions in a Franco-Spanish tax treaty. The terms of the initial loan agreement, executed by Maritima and the banks on March 26, 1972, called for the repayment of all advances in 40 semi-annual installments. In order to obtain approval for the loan from the central bank of Spain, Banco de Espana, which was required for all borrowing by Spanish corporations from non-Spanish sources, Maritima could not prepay the loan for 10 years. Security for this loan was provided by dollar deposits made by another Gulf subsidiary for the account of the three French banks in amounts equal to the advances made under the loan to Maritima. Gulf was not a party to the loan agreement or the security agreement.

Before *La Santa Maria* was completed, the decision was made to increase the size of the vessel to approximately 360,000 dead weight tons. In March 1974, the construction contract with Astano was amended to reflect the increased size and cost of the vessel. By letter dated October 2, 1974, Gulf formally assigned the Astano construction contract concerning the incomplete *La Santa Maria* to Maritima.

Prior to completion of *La Santa Maria*, officials of Gulf and Maritima determined that the tanker could not be utilized as planned, in part because of the failure of the Spanish Government to improve the seaport at Huelva, Spain, to accomodate very large vessels such as *La Santa Maria*. Therefore, Gulf and Maritima decided to sell *La Santa Maria* to Refineria de Petroleos del Norte, S.A. (Petronor), a Spanish corporation, 40-percent owned by Gulf, that operated an oil refinery near the deep water port at Bilbao, Spain.

The transfer of *La Santa Maria* was to be accomplished by the assignment of the Astano construction contract from Maritima to Petronor. So that Petronor could avoid certain Spanish taxes on the transaction, Gulf and Maritima agreed to make all remaining payments due under the construction contract prior to the assignment to Petronor. In view of the

new specifications agreed to by Astano and Gulf, the decision to prepay the construction contract required that Maritima acquire additional financing to complete payment of the final cost of the vessel, $53.2 million. As a result, with the permission of Banco de Espana, in May 1975, Maritima entered into a loan agreement with two of the same French banks that provided the initial financing, Banque WORMS and Credit Industriel et Commercial. The supplemental financing agreement provided for a $20-million short-term loan to Maritima prepayable at any time. This loan was secured by guarantees provided by Gulf rather than dollar deposits.

Petronor ultimately agreed to pay the equivalent of $62.2 million as the purchase price for *La Santa Maria*. After subtracting the total cost of $53.2 million, which Petronor paid in an equivalent amount of Spanish pesetas, Maritima realized a profit of $9 million. Maritima and Petronor agreed that the profit would be reduced by $2 million as a retroactive reduction in the price of certain crude oil purchases by Petronor. The reason for this adjustment was that certain deliveries of crude oil to Petronor contained excessive amounts of basic sediment and water. Gulf originally contemplated that the remaining profit on the sale of *La Santa Maria* would be paid via increased freight rates paid by Petronor to Maritima retroactively to January 1, 1974. Ultimately, however, Petronor agreed to divert the remaining $7 million profit from Maritima to Gulftankers, another Gulf subsidiary, by way of increased freight rates paid by Petronor to Gulftankers, which delivered crude oil to Petronor in its non-Spanish flag vessels in the regular course of its business. Maritima received no consideration from Gulftankers, Petronor, or Gulf for the agreement to give up its profit on the sale of *La Santa Maria*.

The exchange of the $53.2 million in pesetas for dollars necessary to repay the French loans required the approval of Banco de Espana. Maritima was allowed to exchange $20 million in pesetas immediately and repaid the supplemental short-term loan from the French banks. However, permission was not immediately granted to exchange the remaining $33.2 million in pesetas for dollars to repay the initial loan. Without special permission the $33.2 million in pesetas

could only be converted in an amount equal to that required to make the regular installment payments due under the loan until the 10-year prepayment prohibition expired. As Maritima had no business use for pesetas in Spain, the "blocked" pesetas created considerable concern among the management of Gulf and Maritima. Numerous internal correspondence and memoranda at Gulf discussed ways to expatriate the "blocked" pesetas or, at a minimum, to shield those pesetas from interest rate, devaluation, and political risks. The internal documents of Gulf make clear that Gulf, and not solely Maritima, was the party most interested in repatriating the blocked pesetas. Ultimately, permission to convert the blocked pesetas to dollars was granted by Banco de Espana and the loan was repaid after the taxable years in issue.

The freight rate adjustment to which Petronor agreed was reflected as "deferred revenue" in the total amount of $6,611,844 on the financial records of Gulftankers. The deferred revenue account was transferred to Afran prior to the liquidation of Gulftankers into Gulf on December 29, 1975. The transfer to Afran of the deferred revenue account resulted in an increase in the payable from Afran to Gulftankers arising out of the transfer of all of the assets of Gultankers.

The Commissioner determined that Gulf received a constructive dividend for the taxable year 1975 equal to the freight rate adjustment of $6,611,844. The Commissioner determined, in the alternative, that Transocean, a wholly owned Gulf subsidiary, realized a constructive dividend in the same amount for the taxable year 1975. As of December 31, 1975, the current or accumulated earnings and profits of Petronor and Maritima each equaled or exceeded $6,611,844.

### Payables to GS & D and Gulf Overseas

During the taxable years in issue, Gulf and its affiliates maintained a centralized cash management system to record and offset intercompany payables and receivables. This system was designed to minimize cash transfers among affiliated companies and to maximize the availability of cash for investment opportunities. In the most general

terms, these goals were met, in the case of transactions between an affiliate and an unrelated person, by having Gulf actually disburse or receive any cash payments required in the transaction on behalf of its affiliate. Movements of cash in transactions between affiliates were minimized by having those payment obligations represented as intercompany receivables or payables subject to offset by other transactions of the affiliates with Gulf or other affiliates.

The centralized cash management system was reflected in the bookkeeping records of Gulf in four accounts, designated in its uniform system of accounts as accounts 1950, 1960, 1970, and 1980. Account 1950 is used to record the balance of long-term intercompany receivables and payables between Gulf and its affiliates. A separate 1950 account was maintained with respect to each affiliate in the unconsolidated financial records of Gulf and the balance shown therein reflected the intercorporate receivable due Gulf from the affiliate or payable due the affiliate from Gulf. Each affiliate also maintained an account 1950 in its financial records reflecting the same amount shown on Gulf's records as due from or owing to Gulf.

The operation of the cash management system may be illustrated, in the case of transactions with unrelated parties, as follows: Affiliate, in the ordinary course of its business, manufactures and sells products to unrelated parties. Affiliate also purchases necessary materials from unrelated parties. Upon the purchase of materials, Affiliate requests Gulf to disburse the cash to the materials vendor. Upon making the payment on behalf of Affiliate, Gulf records a credit to "cash" and a debit to the intercompany receivable account established for Affiliate, "1950-Affiliate," in the amount of the payment. On its books of account, Affiliate shows the amount of the payment in its 1950 account as a credit to reflect the payable to Gulf, and debits its purchases account in the same amount. When Affiliate sells its product, the purchaser is directed to remit the purchase price directly to Gulf, which deposits the cash in its bank account, debits "cash," and credits "1950-Affiliate" on its books of account in the amount that was received as payment for the product. Simultaneously, Affili-

ate would record the sale in its books of account as a debit to its 1950 account to show the receivable from Gulf and credit "sales" for the amount of the price charged for the product sold.

Generally, all transactions between Gulf and its affiliates and among its affiliates are accomplished without the actual transfer of cash. Under Gulf's cash management system, such intercompany transactions are ultimately reflected as a single balance representing either an amount owed to the affiliate or owed to Gulf in account 1950. However, unlike a transaction with an unrelated party, the path to a single 1950 balance between Gulf and each of its affiliates is less direct.

Generally, receivables and payables generated by transactions by an affiliate with Gulf or with other affiliates are initially recorded in account 1970. An affiliate has a separate 1970 account for each affiliate with which it does any business. For example, if Affiliate A purchases material from Affiliate B and sells finished products to Affiliate C, Affiliate A will record in its books of account a credit to its account "1970-Affiliate B" in the amount of the purchases and a debit to its account "1970-Affiliate C" in the amount of the sales price for the finished products. Correspondingly, Affiliates B and C will record these transactions in their "1970-Affiliate A" account as a debit and a credit, respectively. At the end of each month, each affiliate's 1970 account balances are cleared by way of reversing journal entries and the aggregate amount from these accounts is recorded as a receivable or payable directly with Gulf in account 1960. The transfers to account 1960 consolidate multiple intercompany receivable and payable balances into a single amount either due to or owed by Gulf with respect to each affiliate. A 1970 account will not be cleared to account 1960 in the event one of the affiliates that was a party to an intercompany transaction failed, because of human error or otherwise, to record the receivable or payable in its 1970 account for the other affiliate. Only if both affiliate's respective 1970 accounts are in balance will they be subject to the monthly clearinghouse effect of account 1960.

Account 1980 closely resembles account 1970 in purpose. However, unlike 1970 accounts, a company that uses account 1980 instead of or in combination with account 1970 will not automatically clear the account on a monthly basis, but only after overt action by the comptroller's office. There are various reasons why an affiliate might use account 1980; one of which is that foreign subsidiaries may be required under the currency regulations of the country of their incorporation to settle receivables and payables in cash rather than by intercompany offset.

The balances in account 1960 between Gulf and each affiliate are reviewed on a quarterly basis. At the close of the following month, the balances in the 1960 accounts are recharacterized as long-term receivables or payables and transferred to account 1950 for later settlement.

Although each 1950 account represents a net payable or receivable between Gulf and one of its affiliates, there is no set time for settlement. No formal notes were executed between Gulf and its affiliates in regard to the obligation evidenced by the balances in the cash management accounts. No interest was charged or paid on the amounts reflected in the cash management accounts during the taxable year in issue.

At issue in this case are the tax consequences of the payable balances in accounts 1950 maintained by Gulf for two of its foreign subsidiaries, Gulf Overseas Co., Inc. (Gulf Overseas) and Gulf Supply and Distribution (GS & D). During the taxable year 1974, Gulf owned 100 percent of Gulf Overseas, a Panamanian corporation. During the taxable years 1974 and 1975, Gulf owned 100 percent of GS & D, a Bahamian corporation, indirectly through other wholly owned subsidiaries. Gulf Overseas engaged in the business of trading liquidified petroleum gas (LPG) products and GS & D purchased and sold aviation fuel.

Pursuant to Gulf's cash management system, the proceeds of the sale of LPG product sold by Gulf Overseas and the proceeds of the sale of aviation fuel sold by GS & D were paid directly to Gulf by the purchasers and recorded in the appropriate 1950 accounts. Also pursuant to the cash management system, the intercompany obligations incurred in the purchases of LPG and aviation fuel by Gulf Overseas

and GS & D were initially recorded in the 1970 or 1980 account established by Gulf Overseas and GS & D for the affiliate with which the purchase transactions occurred. In accordance with the cash management system, the balances shown in the respective accounts 1970 and 1980 were ultimately converted into a single net receivable or payable between Gulf and Gulf Overseas and GS & D by transfer to account 1960, the balance of which was transferred to account 1950 on a quarterly basis.

Shown below are the end of month balances of Gulf Overseas for accounts 1950, 1960, and the aggregate end of month balances of accounts 1970 and 1980 as shown on the books of account of Gulf Overseas:

### GULF OVERSEAS CO., INC.

ANALYSIS OF GULF RECEIVABLES AND PAYABLES
IN ACCOUNTS 1950, 1960 AND AGGREGATE ACCOUNTS
1970 AND 1980 BALANCES FOR THE PERIOD
FROM 12/31/73 TO 12/31/75

|  | Long-term 1950 | Short-term 1960 | Short-term 1970 | Short-term 1980 |
|---|---|---|---|---|
| December 1973 | $3,734,165 | (1) |  | ($100) |
| January | 5,474,458 | (1) |  | (100) |
| February | 6,482,215 | (2) |  | (100) |
| March | 15,848,437 | (1) |  | (100) |
| April | 21,254,822 | (2) |  | (3,017) |
| May | 24,403,795 | (2) |  | (5,074) |
| June | 30,605,277 | (2) |  | (5,074) |
| July | 39,402,887 | 1 |  | (5,074) |
| August | 44,311,137 | (2) |  | (5,074) |
| September | 14,467,050 | (2) |  | (5,431) |
| October | 17,905,758 | (1) | ($5,871,779) | (5,431) |
| November | 21,341,065 | (5,871,780) | (3,579,613) | (5,431) |
| December 1974 | 13,999,541 | (1) |  | (5,431) |
| January | 17,789,245 | (1) | (2,825,790) | (5,431) |
| February | 24,367,165 | (2,825,790) | (16,545,818) | (5,431) |
| March | 23,699,562 | (16,545,819) | (2,949,831) |  |
| April | 26,177,876 | (19,495,649) | (2,679,342) |  |
| May | 29,762,446 | (22,174,991) | (4,245,182) |  |
| June | 12,026,374 | (4,245,182) | (5,029,837) |  |
| July | 13,627,894 | (9,275,019) | (3,160,447) |  |
| August | 13,627,894 | (12,435,467) | 1,362,346 |  |
| September | 6,093,598 | 6,041,009 | (3,869,397) |  |
| October | 6,093,598 | 6,042,431 | (7,038,289) |  |
| November | 6,093,598 | (995,858) | (2,663,768) |  |
| December 1975 |  | (55,197) |  |  |

A positive or debit balance in the entries in the above table indicates a net receivable, while a negative or credit balance indicates a net payable. The very small balances shown under the heading for "Short-Term 1960" represent rounding adjustments.

For the taxable year 1974, the Commissioner determined that the increase in the 1950 account receivable balance between Gulf and Gulf Overseas from the beginning balance of $3,734,165 to the ending balance of $13,999,541, or $10,265,376, represented investment in U.S. property within the meaning of section 956(a)(1) and (b)(1)(C). Therefore, the Commissioner determined that Gulf realized additional taxable income under sections 951 and 956 equal to $662,248, an amount not exceeding the earnings and profits of Gulf Overseas.

Shown below are the end of month balances of GS & D for accounts 1950, 1960, and the aggregate end of month balances of accounts 1970 and 1980 as shown on the books of account of GS & D.

GULF SUPPLY AND DISTRIBUTION CO., LTD.

ANALYSIS OF GULF RECEIVABLES AND PAYABLES
IN ACCOUNTS 1950, 1960 AND AGGREGATE ACCOUNTS
1970 AND 1980 BALANCES FOR THE PERIOD
FROM 12/31/73 TO 12/31/75

|  | Long-term 1950 | Short-term 1960 | Short-term 1970 | Short-term 1980 |
|---|---|---|---|---|
| December 1973 |  |  |  |  |
| January |  |  |  |  |
| February |  |  |  |  |
| March |  |  |  |  |
| April |  |  |  |  |
| May |  |  |  |  |
| June |  |  | $457,745 |  |
| July |  |  | 1,707,739 | ($898,514) |
| August |  | $1,713,817 | (30,855) | (935,000) |
| September |  | 1,689,040 | 862,080 | (1,549,636) |
| October |  | 2,557,198 | (105,394) | (2,112,737) |
| November |  | 2,451,804 | 704,614 | (1,747,244) |
| December 1974 | $2,451,804 | 704,614 |  | (2,746,333) |
| January | 2,451,804 | 704,614 | 665,401 | (2,583,234) |
| February | 2,451,804 | 1,370,016 | 295,780 | (2,761,388) |
| March | 3,821,820 | 295,780 | 135,438 | (2,418,953) |
| April | 3,821,820 | 431,218 | 496,513 | 1,599,001 |

|  | Long-term 1950 | Short-term 1960 | Short-term 1970 | Short-term 1980 |
|---|---|---|---|---|
| May | $3,821,820 | $927,731 | $705,325 | $2,133,940 |
| June | 4,749,551 | 705,325 | 1,310,256 | 3,538,694 |
| July | 4,749,551 | 2,015,581 | 1,917,640 | 15,005,236 |
| August | 4,749,551 | 3,933,221 | 1,184,079 | 15,005,236 |
| September | 8,682,772 | 1,184,079 | 1,806,164 | 8,985,405 |
| October | 8,682,772 | 2,990,244 | 1,638,234 | 9,271,899 |
| November | 8,682,772 | 4,628,477 | 940,643 | 1,991,435 |
| December 1975 | 9,620,409 | 1,733,081 |  | 243,127 |

For the taxable year 1974, the Commissioner determined that the increase in the 1950 account receivable balance between Gulf and GS & D equal to the ending balance of $2,451,804 represented investment in U.S. property within the meaning of section 956(a)(1) and (b)(1)(C). Therefore, the Commissioner determined that Gulf realized additional taxable income under sections 951 and 956 equal to $410,084, an amount not exceeding the earnings and profits of GS & D.

## OPINION

The Commissioner determined that Gulf received constructive dividends based upon the retroactive adjustment of the charter hire rate between two of its subsidiaries, Afran and Gulftankers, and the increase in the freight rate charged by Gulftankers to Petronor in connection with the sale of *La Santa Maria* by Maritima, another Gulf subsidiary. The Commissioner also determined that Gulf realized taxable income for the taxable year 1974 under section 956 resulting from the increase in balances of accounts payable to two of its foreign subsidiaries. These determinations by the Commissioner are presumptively correct and petitioner bears the burden of proof. *Welch v. Helvering*, 290 U.S. 111 (1933); Rule 142(a). For clarity we have divided our opinion into separate sections dealing with the constructive dividends issues and the section 956 issue.

### Constructive Dividends

Under section 61(a)(7), gross income includes dividends. The term "dividend" is defined in section 316(a) as a

distribution of property by a corporation to its shareholders out of its earnings and profits. There is no requirement that the dividend be formally declared or even intended by the corporation. See, e.g., *Sachs v. Commissioner*, 277 F.2d 879 (8th Cir. 1960), affg. 32 T.C. 815 (1959). Distributions by a corporation will be treated as dividends to the shareholder if the distributions are made for the shareholder's personal benefit; the funds need not be distributed directly to the shareholder. *Rushing v. Commissioner*, 441 F.2d 593 (5th Cir. 1971), affg. 52 T.C. 888, 893 (1969); *Rapid Electric Co. v. Commissioner*, 61 T.C. 232, 239 (1973). It is also clear that a transfer of property from one corporation to another corporation can constitute a constructive dividend to their common shareholder. *Sammons v. Commissioner*, 472 F.2d 449 (5th Cir. 1972), affg. in part, revg. in part, and remanding a Memorandum Opinion of this Court.

Before we will characterize a transfer of property from one corporation to another as a constructive dividend to a common owner, we must first examine the transfer under a two-part test.[2] The first, or objective, part of the test asks: "did the transfer cause funds or other property to leave the control of the transferor corporation and did it allow the stockholder to exercise control over such funds or property either directly or indirectly through some instrumentality other than the transferor corporation." *Sammons v. Commissioner, supra* at 451. The second, or subjective, test requires that we determine whether the transfer was prompted primarily by a business purpose of the transferring corporation or rather a shareholder purpose of the common owner. *Sammons v. Commissioner, supra* at 451.

[2] We do not agree with petitioner that an allocation by the Commissioner under sec. 482 is a prerequisite to a determination that a constructive dividend has been made because of intercompany transfers. Application of sec. 482 lies within the discretion of the Commissioner, and the taxpayer cannot require its use. Sec. 1.482-1(b)(3), Income Tax Regs. In its brief, petitioner cites no authority for its position and merely argues that the failure of the Commissioner to use sec. 482 denies it the opportunity to avail itself of certain relief provisions available only after a sec. 482 allocation is made. See, e.g., Rev. Proc. 65-17, 1965-1 C.B. 833; Rev. Rul. 82-80, 1982-1 C.B. 89. Petitioner's argument relies solely on vague notions of fairness. Even if the relief provisions referred to by petitioner would have been available in the event of a sec. 482 allocation, a requirement that the Commissioner use sec. 482 before determining that a constructive dividend has been paid would improperly impinge on the discretion of the Commissioner.

## Retroactive Change in Charter Hire Rates
## Between Afran and Gulftankers

We have no difficulty finding that the agreement by Afran to accept retroactive reduction in the charter hire rate for the vessels chartered to Gulftankers under 1-year time charter agreements represents a transfer of property from one corporation to another corporation, both of which were under the common control of Gulf. Afran had a right to receive charter income at the higher rate negotiated at the beginning of 1975 and, by acceding to the charter hire rate reduction, gave up property equal in value to the amount of the aggregate charter hire rate adjustment. We need say no more about the objective test; the more critical inquiry in this instance is whether the primary purpose of the transfer was for the benefit of the common owner, Gulf.

Petitioner argues that the adjustment to the charter hire rates was in keeping with its practice of setting those rates at fair market value. We are not persuaded that this was the purpose of the adjustment. The 1-year time charter agreements, which are not in the record, require that the charter hire rate be set at the beginning of the year. In accordance with the charter agreements and with the assistance of Gulf's marine charter department, the rates were set at the beginning of the year 1975 at an estimate of the rate that would be charged for 1-year time charters in an arm's-length transaction. This was the same procedure that had been followed since 1971 when the arrangement between Afran and Gulftankers began. In January 1975, the rate was set based upon recently published worldscale rates, which were converted to a per-dead-weight-ton figure, and upon information obtained from professional tanker brokers. The rate thus established was a reasonable estimate of the rate that would be charged in an arm's-length transaction at the beginning of 1975. The adjustment in the 1975 charter hire rates represented the first time such an adjustment was made. Such retroactive adjustments to 1-year time charters were virtually unknown in the industry. Furthermore, the use of a composite rate strongly weighted in favor of the spot charter rate was not a method used in the industry to set short-term time charters. Perhaps even more telling is the fact that the adjustment was made at

the direction of Gulf's tax department and without consultation with the marine chartering department.

We doubt that such adjustments were called for in the agreements between Afran and Gulftankers. We have found as fact that the tanker market experienced a severe decline in 1975; however, petitioner has not demonstrated that there was any hardship to either Afran or Gulftankers caused by the decline in the tanker market. In the absence of a specific provision pegging the contract price to some floating market rate, it seems to us that market fluctuations are one of the risks accepted by the parties to any continuing agreement whether the contract is long-term or only for 1 year as in this case. When an agreement calls for the price or rate to be fixed at the beginning of the period of the agreement, the reasonableness of the rate viewed with the clarity of hindsight is not generally relevant. Even if the rates as adjusted were equal to fair market value for the taxable year 1975 and Afran had a business purpose for reducing the charter hire rate without any consideration, which we doubt, we find that the very real and direct benefit accruing to the common shareholder, Gulf, constitutes the primary purpose for the adjustment.

In contemplation of its liquidation, Gulftankers transferred all of its assets, including the time charter agreements with Afran, to Afran. To reflect this transaction Gulftankers recorded in its books of account a very large amount receivable from Afran. This receivable was distributed to Gulf in liquidation of Gulftankers. As a result of the charter hire rate adjustment, the amount of charter fees Gulftankers owed Afran under the 1975 time charters was reduced by approximately $8.8 million. This adjustment caused a corresponding increase in the net payable from Afran to Gulftankers arising out of the preliquidation transfer of assets of $8.8 million. The net effect of the sale of Gulftankers' assets, its subsequent liquidation into Gulf, and the charter hire rate adjustment was that Gulf received $8.8 million as a tax-free repayment of debt. If the charter hire rates had not been adjusted, Afran would have recognized an additional $8.8 million in gross income. If the $8.8 million were paid by Afran to Gulf as a distribution of earnings and profits, it would have resulted in a taxable

dividend to Gulf for which no dividends received deduction would have been allowable. Secs. 243, 301(c), 316.

Petitioner argues that any benefit received by Gulf was indirect. In this regard petitioner contends that the rate adjustment and the liquidation of Gulftankers were unrelated events and that we should ignore the latter. We refuse to do so. Although there was a business purpose for consolidating Gulf's foreign shipping operations, we cannot ignore the fact that the decision to liquidate Gulftankers provided petitioner with what it must have thought were inviting tax planning opportunities. For whatever reason, Gulftankers was liquidated near the end of the taxable year 1975. As a result, petitioner directly benefited from a transaction, the charter hire rate adjustment, nominally carried out by two affiliated corporations. We uphold the Commissioner's determination on this issue.

## Sale of La Santa Maria

We are quite satisfied that the diversion of part of the purchase price of *La Santa Maria* from the seller, Maritima, to another Gulf subsidiary, Gulftankers, via an increase in freight rates charged to the purchaser constitutes a transfer of property between two corporations under common ownership. Petitioner concedes as much on brief. Again the critical inquiry is whether the principal purpose of the transfer was to confer a benefit upon the transferring corporation or upon the common shareholder. Petitioner contends that the primary purpose of the freight rate increase was the desire by Maritima to expatriate part of the purchase price by legal means. Petitioner claims that Maritima had no business use for pesetas and that there was, therefore, a valid business purpose for the arrangement with Petronor to pay higher freight rates to Gulftankers.

Although respondent does not contest the uncontroverted testimony offered by petitioner that the $7 million profit could not be converted from pesetas to dollars, we can certainly find no business purpose of Maritima served by allowing its profit from the sale of *La Santa Maria* to be deflected to Gulftankers without any consideration in return. We believe a more likely conclusion to be drawn from this record is that the arrangement whereby Gulftankers

received Maritima's profit from the sale of *La Santa Maria* primarily served a shareholder purpose. Following the results of this arrangement, we see that the diverted profit from the sale of *La Santa Maria* first appeared as a "deferred revenue" account on the books of Gulftankers in the amount of $6,611,844. This asset, along with the remainder of the assets of Gulftankers, was conveyed to Afran prior to the liquidation of Gulftankers. The profit from *La Santa Maria* thus appeared as an increase in the amount receivable obtained by Gulftankers in exchange for all of its assets, including the "deferred revenue" account. Finally, after the liquidation of Gulftankers, Gulf received the profit from the sale of *La Santa Maria* in the form of tax-free repayment of debt when Afran satisfied this obligation the following year. As can be seen, Gulf, and not Maritima, received a very real benefit from the arrangement to divert the profit from the sale of *La Santa Maria* away from Maritima.

We are also satisfied that the benefit obtained by Gulf was sufficiently direct and was the primary purpose for this transaction. Again we refuse to ignore the fortuitous timing of the liquidation of Gulftankers in determining whether Gulf received a direct, rather than indirect, benefit. The consolidation by Gulf of its foreign marine operations was an independent event, but its occurrence allowed Gulf to receive income from one of its foreign subsidiaries free from U.S. tax, which, if not for the arrangement between Maritima, Petronor, and Gulftankers, would likely have been repatriated only as a taxable dividend. Our conclusion is confirmed by our finding that petitioner contemplated as late as July 1974, that the profit from the sale of *La Santa Maria* would be paid via increased freight rates paid by Petronor to Maritima. Only later did petitioner decide to insert Gulftankers into this transaction.

Because the diverted profit from the sale of *La Santa Maria* came into the hands of Gulf, this case is distinguishable from those cases cited by petitioner wherein it was determined that the benefit conferred upon the common shareholder was too indirect to support the determination of a constructive dividend. See *White Tool & Machine Co. v. Commissioner*, 677 F.2d 528 (6th Cir. 1982), cert. denied 459

U.S. 907 (1982), affg. a Memorandum Opinion of this Court; *Rushing v. Commissioner*, 441 F.2d 593 (5th Cir. 1971), affg. 52 T.C. 888 (1969); *R.T. French Co. v. Commissioner*, 60 T.C. 836, 854-856 (1973).

We uphold the Commissioner's determination on this issue.

### Section 956

We now turn to the question of whether Gulf realized taxable income from two wholly owned foreign subsidiaries due to large payable balances remaining in Gulf's centralized cash management accounting system at the end of the taxable year 1974. The Commissioner based his determination that Gulf received taxable income from Gulf Overseas and GS & D for the taxable year 1974 in the amounts of $662,248 and $410,084, respectively, by virtue of sections 951 and 956 of Subpart F of the Internal Revenue Code. The resolution of this issue requires that we decide whether increases in the balances of account 1950 of Gulf's cash management system, reflecting long-term payables from Gulf to Gulf Overseas and GS & D, represent an increase in the earnings of controlled foreign corporations invested in U.S. property. Sec. 951(a)(1)(B); sec. 956.

Section 951 provides:

SEC. 951. AMOUNTS INCLUDED IN GROSS INCOME OF UNITED STATES SHAREHOLDERS.

(a) AMOUNTS INCLUDED.—

(1) IN GENERAL.—If a foreign corporation is a controlled foreign corporation for an uninterrupted period of 30 days or more during any taxable year, every person who is a United States shareholder * * * of such corporation and who owns * * * stock in such corporation on the last day, in such year, on which such corporation is a controlled foreign corporation shall include in his gross income, for his taxable year in which or with which such taxable year of the corporation ends—

(A) the sum of—

\*       \*       \*       \*       \*       \*       \*

* * * ; and

(B) his pro rata share * * * of the corporation's increase in earnings invested in United States property for such year (but only to the extent not excluded from gross income under section 959(a)(2)).

Section 956 provides:

SEC. 956. INVESTMENT OF EARNINGS IN UNITED STATES PROPERTY.

(a) GENERAL RULES.—For purposes of this subpart—

(1) AMOUNT OF INVESTMENT.—The amount of earnings of a controlled foreign corporation invested in United States property at the close of any taxable year is the aggregate amount of such property held, directly or indirectly, by the controlled foreign corporation at the close of the taxable year, to the extent such amount would have constituted a dividend (determined after the application of section 955(a)) if it had been distributed.

\* \* \* \* \* \* \*

(b) UNITED STATES PROPERTY DEFINED.—

(1) IN GENERAL.—For purposes of subsection (a), the term "United States property" means any property acquired after December 31, 1962, which is—

\* \* \* \* \* \* \*

(C) an obligation of a United States person; \* \* \*

Sections 951(a)(1)(B) and 956 were enacted as part of Subpart F by the Revenue Act of 1962 (Pub. L. 87-834, 76 Stat. 960) in response to perceived abuses by U.S. taxpayers through the use of controlled foreign corporations. These particular sections were aimed at preventing the repatriation of income to the United States in such a way that the income is not subject to U.S. taxation. H. Rept. 1447, 87th Cong., 2d Sess. (1962), 1962-3 C.B. 405, 462. By taxing U.S. shareholders on the increased investment of their controlled foreign corporations in the United States, Subpart F treats the amount of the increased investment much like a constructive dividend to the U.S. shareholders. See H. Rept. 1447, *supra*; S. Rept. 1881, 87th Cong., 2d Sess. (1962), 1962-3 C.B. 707, 794; *Dougherty v. Commissioner*, 60 T.C. 917, 926, 929 (1973).

The parties are in apparent agreement that Gulf Overseas and GS & D are foreign corporations controlled, within the meaning of section 958, by a U.S. shareholder, Gulf. The parties also agree that the balances in account 1950 represent legitimate obligations of Gulf. The point upon which petitioner and respondent part company is whether a balance in a 1950 account is "an obligation of a United States person" within the meaning of the regulations promulgated under section 956.

Section 1.956-2(d)(2), Income Tax Regs., provides that "the term 'obligation' includes any bond, note, debenture, certificate, bill receivable, account receivable, note receiv-

able, open account, or other indebtedness, whether or not issued at a discount and whether or not bearing interest." However, the regulation also excepts from its broad definition of "obligation"

(ii) Any indebtedness (other than an indebtedness arising in connection with the sale or processing of property) which—
(a) Is collected within one year from the time it is incurred.
[Sec. 1.956-2(d)(2)(ii), Income Tax Regs.]

Petitioner contends that although there were balances in its accounts 1950 payable from Gulf to Gulf Overseas and GS & D throughout the relevant years, because of the many offsetting transactions reflected in account 1950, all of the obligations arising from the individual transactions were collected within 1 year from the time they were incurred. According to petitioner, this result is achieved by offsetting the amount of each new receivable against the oldest payable obligation by way of analogy to the first-in, first-out (FIFO) method of inventory identification and valuation.

Respondent, on the other hand, contends that the payable balances in account 1950 represent one indivisible, although fluctuating, payment obligation to an affiliated corporation. Accordingly, respondent contends that because there were outstanding balances in the Gulf Overseas and GS & D 1950 accounts throughout the relevant times, the obligation represented therein was not collected within 1 year. Furthermore, because the balances in the pertinent accounts 1950 increased from the beginning of the taxable year 1974, to yearend, respondent contends that Gulf must report those increases as taxable income under the nearly mechanical provisions of section 951 and 956(a). We find respondent's arguments to be persuasive.

The cash management system instituted by Gulf decreases inefficient movements of cash in two ways. First, in transactions with unrelated parties, Gulf receives and disburses cash on behalf of its subsidiaries. Payments and receipts of cash by Gulf are then reflected as a payable or receivable in account 1950 on the books of Gulf and its affiliates. Second, the cash management system serves as a clearinghouse to offset intercompany receivables and payables, thereby preventing unnecessary cash movements

between related companies. Under the system, intercompany obligations reflected in accounts 1970 and 1980 are moved to account 1960 where they are reduced to single payable or receivable balances between each affiliate and Gulf before they are ultimately recorded in account 1950. Regardless of which path a transaction follows before it is reflected in account 1950, the end result is a single balance representing an obligation between Gulf and one of its affiliates. If an account 1950 shows a negative or credit balance on Gulf's books of account (reflected as a positive or debit balance on the books of the affiliate), this indicates that Gulf owes that affiliate an amount of money equal to the balance of the account. This is nothing more than a single open account loan.

The fact that the individual transactions that give rise to the upward and downward movements in account 1950 lose their individual identity under the cash management system is shown by petitioner's inability to trace individual transactions through the cash management system. The cash management account system was not designed to trace individual transactions on a FIFO basis or otherwise. One of petitioner's witnesses, the director of general administrative accounting in the office of the comptroller for Gulf, testified that he, in the course of his job, had traced only one transaction from account 1950 to its origin; the witness also added that this was the only transaction in that account during the month. In any other circumstances, the tracing required by the FIFO method petitioner alleged to be implicit in its cash management system could only be done through the use of substantial time, money, and manpower. Such theoretical ability to trace the many individual transactions recorded in the cash management system does not make such tracing a part of the system in actuality. Petitioner has failed in its burden of proof on this issue. Rule 142(a).

The cash management system of Gulf and its affiliates apparently satisfied its avowed purposes of avoiding inefficient movements of cash and centralizing cash assets to take advantage of investment opportunities. Nevertheless, this does not alter the fact that the payable balances of the cash management system create one of the situations at

which section 956 was aimed. Gulf's foreign affiliates have earned income free from U.S. taxation. Gulf has then repatriated those earnings by way of the large payable balances maintained in its cash management system. Absent the provisions of Subpart F, Gulf has complete and indefinite control over those earnings while the earnings escape U.S. taxation.

So long as there is a credit balance in an account 1950 on the books of account of Gulf, there exists an obligation within the meaning of section 1.956-2(d)(2), Income Tax Regs. In this regard, we are focusing on the existence of a balance and not the fluctuations in that balance. The fluctuations in the balance simply reflect the nature of a loan in the form of an "open account." Sec. 1.956-2(d)(2), Income Tax Regs.

## Conclusion

We have found in favor of respondent on the constructive dividend issues and the issue on the application of section 956 to the payable balances in petitioner's cash management system. Although we have found for respondent on all the above issues, there are many other issues in this case and a Rule 155 computation will be necessary. We again point out that this opinion resolves certain severed issues only, and that all other issues not previously decided in this case[3] are still before the Court.

---

[3]Other issues in this docket have been decided as follows: the "Intangible Drilling and Development Costs" issue was decided by this Court in *Gulf Oil Corp. v. Commissioner*, 87 T.C. 324 (1986); the "Worthless Properties" issue was decided by this Court in *Gulf Oil Corp. v. Commissioner*, 87 T.C. 135 (1986); the "Kuwait Nationalization" issue was decided by this Court in *Gulf Oil Corp. v. Commissioner*, 86 T.C. 937 (1986); the "Iranian Foreign Tax Credit" issue was decided by this Court in *Gulf Oil Corp. v. Commissioner*, 86 T.C. 115 (1986); the "North Sea Farmout" issue was decided by this Court in *Gulf Oil Corp. v. Commissioner*, 84 T.C. 447 (1985).