SHERWOOD PROPERTIES, INC., PETITIONER v.
COMMISSIONER OF INTERNAL
REVENUE, RESPONDENT

FREEDLAND INDUSTRIES CORP., PETITIONER v.
COMMISSIONER OF INTERNAL
REVENUE, RESPONDENT

Docket Nos. 25018-83, 25019-83.      Filed September 22, 1987.

*Morton Noveck, Harold Noveck*, and *David G. Hertzberg*, for the petitioners.
*Mark E. Rizik*, for the respondent.

GOFFE, *Judge*: The Commissioner determined a deficiency in petitioner Sherwood Properties, Inc.'s Federal income tax for the taxable year ended June 30, 1978, in the amount of $128,650.79. The Commissioner also determined a deficiency in petitioner Freedland Industries Corp.'s Federal income tax for the taxable year ended June 30, 1976, in the amount of $141,283.67.[1] After concessions,[2] the issues for decision are: (1) Whether advances to petitioner Freedland Industries Corp. by a Canadian corporation owned by petitioners constituted an investment in U.S. property within the meaning of section 956;[3] and (2) whether there was an exchange pursuant to the amalgamation of two Canadian corporations, which began before January 1, 1978, such that the transitional rule contained in section 367(d) was applicable.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the accompanying exhibits are incorporated by this reference.

Petitioners were Michigan corporations and had their principal offices in Dearborn, Michigan, at the time of the filing of the petitions in these cases. Petitioners filed their Federal income tax returns based upon a taxable year ended June 30.

Ruth Freedland owned 100 percent of the stock of Sherwood Properties, Inc. (Sherwood), which leased properties to Freedland Industries Corp. (Freedland). Ruth and her

---

[1]The adjustments eliminated the net operating loss incurred by Freedland Industries Corp. for the taxable year ended June 30, 1978, which was available for carryback. This affected the taxable income and resulting tax liability of Freedland Industries Corp. for the taxable year ended June 30, 1976.

[2]There were other adjustments to the taxable income of petitioner Freedland Industries Corp. Petitioners, however, failed to introduce any evidence at trial concerning the issues. Furthermore, they did not address the issues in their brief. We can only conclude that petitioners have conceded the issues.

[3]Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as amended and in effect for the relevant years, and all Rule references are to the Rules of Practice and Procedure of this Court.

husband, Harry Freedland, owned 61.68 percent of the stock of Freedland, which was involved in steel sales, steel processing, steel stampings, and plating of auto parts. The remaining shares of Freedland were owned by Harry's children, his brother Ben, and Ben's children. Freedland owned 89 percent of the stock of Freedland Industries Ltd. (Freedland Ltd.), a Canadian corporation which was in the business of plating and stamping automobile parts. M. Gobush, an employee of Freedland, owned the remaining 11 percent of the stock. Freedland owned 50.01 percent of Huron Steel Products Co. Ltd. (Huron), a Canadian corporation which was in the business of selling steel and stamping metal parts for the automobile industry. Freedland was a supplier of steel to Huron. Sherwood owned the remaining 49.99 percent of the stock of Huron.

Huron was located in a residential area and there was no room for expansion. On May 1, 1977, Huron entered into an agreement to sell all of its machinery and real estate to a third party for $1 million. The sale was consummated by June 15, 1977. In July 1977, Huron advanced Freedland $300,000, and in August 1977, Huron advanced Freedland an additional $200,000. Freedland recorded the advances as loans payable in its general ledger. The audited financial statements of Huron for the year ended December 31, 1977, show the advances as a note receivable from Freedland, which provided for 5-percent interest, in the amount of $529,400. This represented the Canadian currency equivalent of $500,000 in U.S. currency. A note was not executed to evidence the indebtedness. However, interest was accrued and paid on the advances.

On December 15, 1977, the shareholders of Freedland Ltd. and Huron approved a plan of amalgamation whereby the two corporations agreed to amalgamate as of the close of business on December 31, 1977. The new entity was called Freedland Industries Ltd. (New Freedland Ltd.). On December 16, 1977, the articles of amalgamation, which include the amalgamation agreement, were sent to the Ministry of Consumer and Commercial Relations for the Province of Ontario.

On January 10, 1978, the Companies Division of the Ministry of Consumer and Commercial Relations returned

the articles of amalgamation for insertion of the dates of the shareholders' approval and the correction of a discrepancy regarding the number and par value of authorized shares of Freedland Ltd. On February 16, 1978, the Companies Division of the Ministry of Consumer and Commercial Relations again returned the articles of amalgamation for the insertion of the dates of the shareholders' approval.

On March 10, 1978, the Controller of Records of the Companies Division of the Ministry of Consumer and Commercial Relations issued a certificate of amalgamation to New Freedland Ltd. The certificate of amalgamation provided that the articles of amalgamation were effective on December 31, 1977. The amalgamation was made pursuant to section 197 of the Business Corporations Act, Ont. Rev. Stat., ch. 53 (1970), as amended. After the amalgamation, Freedland owned 69.5 percent of New Freedland Ltd., Sherwood owned 25 percent, and M. Gobush owned 5.5 percent.

With respect to the amalgamation of Freedland Ltd. and Huron, petitioners did not file a ruling request with the Internal Revenue Service pursuant to section 367(a).

The general ledger of Freedland reflected a $100,000 repayment of the advances of $500,000 on April 30, 1978, leaving a balance of $400,000. The audited financial statements of Freedland for the year ended June 30, 1978, classified the $400,000 as an "Accounts payable: Affiliated companies." The total amount shown as "Accounts payable: Affiliated companies" for the years ended June 30, 1977, and June 30, 1978, was $2,084,229.43 and $2,771,837.31, respectively. The total assets of Freedland for the years ended June 30, 1977, and June 30, 1978, were $10,103,114, and $10,639,281, respectively. During the year ended June 30, 1978, Freedland received from New Freedland Ltd. and its predecessors merchandise and cash in the amount of $7,262,038.75, and made payments to New Freedland Ltd. and its predecessors in the amount of $6,574,430.87. Generally, interest was not charged on the monthly trade transactions between Freedland and New Freedland Ltd. and its predecessors.

The audited financial statements of New Freedland Ltd. for the year ended December 31, 1978, show a note receivable from Freedland, which provided for 5-percent interest, in the amount of $423,700. This amount represented the Canadian currency equivalent of $400,000 in U.S. currency. The books of Freedland show that the advances were ultimately repaid in April and May 1979.

On May 27, 1983, the Commissioner mailed a statutory notice of deficiency to each petitioner in which he determined that the advances from Huron to Freedland were an investment in U.S. property under section 956(b) and taxable to petitioners under section 951(a). The Commissioner also determined that the amalgamation of Freedland Ltd. and Huron occurred on December 31, 1977. The Commissioner determined that the amalgamation was covered by section 367 and because petitioners failed to comply with section 367, the exchange of the stock of petitioners in Freedland Ltd. and Huron for stock of New Freedland Ltd. was taxable under section 1248.

OPINION

*Issue 1. Investment in U.S. Property*

Under section 951(a)(1)(B), a U.S. shareholder of a controlled foreign corporation is required to include in gross income his pro rata share of such corporation's increase in earnings invested in U.S. property during the taxable year.[4] The amount of earnings of a controlled foreign corporation invested in U.S. property for the taxable year is the aggregate amount of such property held at the close of the taxable year but only to the extent that the amount would

---

[4]Sec. 951(a)(1)(B) provides:

SEC. 951(a). AMOUNTS INCLUDED.—

(1) IN GENERAL.—If a foreign corporation is a controlled foreign corporation for an uninterrupted period of 30 days or more during any taxable year, every person who is a United States shareholder * * * of such corporation and who owns * * * stock in such corporation on the last day, in such year, on which such corporation is a controlled foreign corporation shall include in his gross income, for his taxable year in which or with which such taxable year of the corporation ends—

* * * * * * *

(B) his pro rata share * * * of the corporation's increase in earnings invested in United States property for such year (but only to the extent not excluded from gross income under section 959(a)(2)).

have constituted a dividend if it had been distributed during the year. Sec. 956(a)(1).[5] Sections 951(a)(1)(B) and 956 were enacted by the Revenue Act of 1962, Pub. L. 87-834, 76 Stat. 960, in response to perceived abuses by U.S. taxpayers through the use of controlled foreign corporations. These particular sections were aimed at preventing the repatriation of income to the United States in such a way that the income is not subject to U.S. taxation. H. Rept. 1447, 87th Cong., 2d Sess. (1962), 1962-3 C.B. 405, 462; *Dougherty v. Commissioner*, 60 T.C. 917, 929 (1973).

Section 956(b)(1)(C) provides that the term "United States property" includes an "obligation of a United States person." However, the term "United States property" does not include any obligation of a U.S. person arising in connection with the sale or processing of property if the amount of such obligation outstanding at no time during the taxable year exceeds the amount which would be ordinary and necessary to carry on the trade or business of both parties. Sec. 956(b)(2)(C).[6] Whether the amount of an obligation is ordinary and necessary is to be determined from all the facts and circumstances in each case. Sec. 1.956-2(b)(1)(v), Income Tax Regs.

The term "obligation" includes any "bond, note, debenture, certificate, bill receivable, account receivable, note receivable, open account, or other indebtedness, whether or not issued at a discount and whether or not bearing

---

[5]Sec. 956(a)(1) provides:

SEC. 956(a). GENERAL RULES.—For purposes of this subpart—

(1) AMOUNT OF INVESTMENT.—The amount of earnings of a controlled foreign corporation invested in United States property at the close of any taxable year is the aggregate amount of such property held, directly or indirectly, by the controlled foreign corporation at the close of the taxable year, to the extent such amount would have constituted a dividend (determined after the application of section 955(a)) if it had been distributed.

[6]Sec. 956(b)(2)(C) provides:

SEC. 956(b). UNITED STATES PROPERTY DEFINED.—

\* \* \* \* \* \* \*

(2) EXCEPTIONS.—For purposes of subsection (a), the term "United States property" does not include—

\* \* \* \* \* \* \*

(C) any obligation of a United States person arising in connection with the sale or processing of property if the amount of such obligation outstanding at no time during the taxable year exceeds the amount which would be ordinary and necessary to carry on the trade or business of both the other party to the sale or processing transaction and the United States person had the sale or processing transaction been made between unrelated persons;

interest." Sec. 1.956-2(d)(2), Income Tax Regs. However, the term "obligation" does not include any indebtedness (other than an indebtedness arising in connection with the sale or processing of property) which is collected within 1 year from the time it is incurred. Sec. 1.956-2(d)(2)(ii)(a), Income Tax Regs.

Petitioners agree that Huron was a controlled foreign corporation as defined in section 957(a) and that petitioners were U.S. shareholders as that term is used in section 951(a) and defined in 951(b). As a result of petitioners' being U.S. shareholders, they are, by definition, U.S. persons. Sec. 951(b). Petitioners also conceded on brief that the advances created a legitimate obligation. Therefore, the parties agree that the advances were an obligation of a U.S. person. Sec. 956(b)(1)(C). Accordingly, unless the advances come within one of the above referenced exceptions, they are U.S. property and includable in petitioners' income.[7] Sec. 951(a)(1)(B).

Petitioners assert that although Freedland treated the advances on its books as loans payable, Richard Freedland, president of Freedland and Freedland Ltd., and vice president of Sherwood and Huron, testified that the advances were actually to be used by Freedland to maintain Huron's steel allocations in the United States. Petitioners contend that the advances arose in connection with the sale or processing of property and were in an amount which was ordinary and necessary to carry on the trade or business of Freedland and Huron and, therefore, come within the exception contained in section 956(b)(2)(C). Petitioners alternatively contend that if the advances are characterized as loans, they were repaid within 1 year and, therefore, come within the exception contained in section 1.956-2(d)(2)(ii)(a), Income Tax Regs. As a result, petitioners assert that regardless of how the advances are characterized, they are not U.S. property.

Huron was located in a residential area and there was no room for expansion. On May 1, 1977, Huron entered into an agreement to sell all of its machinery and real estate and the sale was consummated by June 15, 1977. Freedland was

---

[7]Petitioners do not contend that Huron did not have sufficient earnings and profits so as to prevent the advances from being treated as dividends. Sec. 956(a)(1).

a supplier of steel to Huron, and Richard Freedland testified that the advances were to be used by Freedland to maintain Huron's steel allocations in the United States. He testified that steel mills permit certain customers to purchase a steel allocation. It is in effect a guarantee that, if steel is ever in short supply, the mill will sell the customer a certain amount of steel. He further testified that Huron's steel allocation was transferred to New Freedland Ltd. pursuant to the amalgamation.

We recognize that there may have been a business reason for Huron to advance funds to Freedland. However, the record is bereft of the specific factors considered in calculating the amount necessary to maintain the steel allocation of Huron. Petitioners point to the fact that during the year ended June 30, 1978, Freedland received from New Freedland Ltd. and its predecessors merchandise and cash in the amount of $7,262,038.75, and made payments to New Freedland Ltd. and its predecessors in the amount of $6,574,430.87. Petitioners assert that this volume of trade indicates that the amount of $500,000 was ordinary and necessary. We are not persuaded. The evidence does not establish how the amount of $500,000 was calculated. The testimony of Richard Freedland that the advances were to be used to maintain the steel allocation of Huron is insufficient to establish that the amount was ordinary and necessary to carry on the business of Huron. In addition, there is no objective evidence that the advances were used for the purpose of maintaining the steel allocation. This evidence may have proved helpful in deciding whether the amount of $500,000 was ordinary and necessary.

Even if we assume that $500,000 was the amount necessary to maintain the steel allocations of Huron, we fail to perceive why the advances were ordinary and necessary to the business of Huron in light of the substantial balances owed by Freedland to Huron and Freedland Ltd. (New Freedland Ltd. after the amalgamation). *Greenfield v. Commissioner*, 60 T.C. 425, 433 (1973), affd. 506 F.2d 972 (5th Cir. 1975). The total amount shown as "Accounts payable: Affiliated companies" on the financial statements of Freedland for the years ended June 30, 1977, and June 30,

1978, was $2,084,229.43 and $2,771,837.31,[8] respectively.[9] The total assets of Freedland for the years ended June 30, 1977, and June 30, 1978, were $10,103,114 and $10,639,281, respectively. We recognize that there was a trading relationship between the companies. Nonetheless, the advances, when considered in light of these balances, look like an attempt to repatriate the earnings of the Canadian corporation. We think this is one of the situations at which sections 951(a)(1)(B) and 956 were aimed. On the basis of the record before us, we are not convinced that the advances were ordinary and necessary to carry on the business of Huron. Therefore, the advances do not fall within the exception contained in section 956(b)(2)(C).

Petitioners alternatively contend that if the advances are characterized as loans, they were repaid within 1 year and, therefore, come within the exception in section 1.956-2(d)(2)(ii)(a), Income Tax Regs.

There was a constant flow of merchandise and cash between Freedland and New Freedland Ltd. and its predecessors. Freedland paid over $6,500,000 during the year ended June 30, 1978, to New Freedland Ltd. and its predecessors. However, we reject petitioners' argument that because Freedland repaid the advances 13 times during the year in terms of the total amount it paid New Freedland Ltd. and its predecessors, the advances were repaid within 1 year. Cf. *Gulf Oil Corp. v. Commissioner*, 87 T.C. 548 (1986).

Petitioners argue that if the bookkeeper for Freedland had credited some of the payments from Freedland to the loan payable account there would be no problem. We will not engage in such speculation. The fact remains that only $100,000 was applied as repayment of the advances within 1 year. The fact that $100,000 was applied as repayment indicates that this amount was specifically designated as such. We doubt that the bookkeeper applied this amount as repayment without some specific instruction to do so, and by the same token, did not apply other payments from Freedland as repayments because there was no specific

---

[8]The outstanding balance of the advances is included in this amount.

[9]For the year ended June 30, 1977, the financial statements of Freedland do not separately state the amount due Huron and the amount due Freedland Ltd. It may have been the case that a large percentage of the balance was due to Freedland Ltd. and only a small percentage of the balance was due to Huron.

instruction to do so. Petitioners have failed to produce testimony or objective evidence that any payments from Freedland to New Freedland Ltd. and its predecessors were erroneously not treated as repayments of the advances. The books of Freedland show that as of June 30, 1978, the outstanding balance was $400,000 and, further, that the advances were not repaid until April and May 1979. Therefore, the advances, if characterized as loans, were not repaid within 1 year and do not come within the exception in section 1.956-2(d)(2)(ii)(*a*), Income Tax Regs. Accordingly, we conclude that the advances are U.S. property and are includable in petitioners' income.

## Issue 2. Amalgamation of Canadian Corporations

Section 367, prior to its amendment by the Tax Reform Act of 1976, Pub. L. 94-455, 90 Stat. 1525, provided that in determining the extent to which gain would be recognized in the case of certain exchanges described in section 332, 351, 354, 355, 356, or 361, a foreign corporation would not be considered a corporation unless, before such an exchange, it was established to the satisfaction of the Commissioner that the exchange was "not in pursuance of a plan having as one of its principal purposes the avoidance of Federal income taxes." Since corporate status is essential to a tax-free organization, liquidation, or reorganization, a failure to satisfy section 367 results in recognition of any gain realized by the participants to a transaction governed by section 367. *American Manufacturing Co. v. Commissioner*, 55 T.C. 204, 232 (1970); *Texas-Canadian Oil Corp., Ltd. v. Commissioner*, 44 B.T.A. 913 (1941); B. Bittker & J. Eustice, Federal Income Taxation of Corporations and Shareholders, par. 17.40, at 17-73 (4th ed. 1979).

The Tax Reform Act of 1976 amended section 367 by establishing separate rules for two different groups of transactions: (i) Transfers of property (other than stock or securities of a foreign corporation) from the U.S. to a foreign person, and (ii) other transfers (including transfers of property into the U.S. and those which are exclusively foreign). Transactions in the first group generally include those transactions where the statutory aim is to prevent the removal of appreciated assets or inventory from U.S. tax

jurisdiction prior to their sale, while transactions in the second group include those where the statutory purpose in most cases is to preserve the taxation of accumulated profits of controlled foreign corporations. S. Rept. 94-938 (1976), 1976-3 C.B. (Vol. 3) 49, 302; H. Rept. 94-658 (1975), 1976-3 C.B. (Vol. 2) 695, 934.With respect to the first groups of transactions, the ruling requirement was retained but a ruling request could be filed as late as 183 days after the beginning of the transfer. Sec. 367(a)(1).[10] With respect to the second group of transactions, the ruling requirement was eliminated. Instead, the Secretary was to promulgate regulations as to when a foreign corporation is not to be considered a corporation. Sec. 367(b)(1).[11]

The amendments generally apply to exchanges beginning after October 9, 1975. Tax Reform Act of 1976, *supra*, sec. 1042(e), 90 Stat. 1639. However, in order to permit the Internal Revenue Service sufficient time to develop the regulations required for transfers into the U.S. and between foreign corporations, a transitional rule was established "requiring that these regulations need not be effective until January 1, 1978." S. Rept. 94-938, *supra*, 1976-3 C.B. (Vol. 3) at 307; H. Rept. 94-658, *supra*, 1976-3 C.B. (Vol. 2) at 939. In the intervening period, transactions which would

---

[10]Sec. 367(a)(1) provides:

SEC. 371(a). TRANSFERS OF PROPERTY FROM THE UNITED STATES.—

(1) GENERAL RULE.—If, in connection with any exchange described in section 332, 351, 354, 355, 356, or 361, there is a transfer of property (other than stock or securities of a foreign corporation which is a party to the exchange or a party to the reorganization) by a United States person to a foreign corporation, for purposes of determining the extent to which gain shall be recognized on such transfer, a foreign corporation shall not be considered to be a corporation unless, pursuant to a request filed not later than the close of the 183d day after the beginning of such transfer (and filed in such form and manner as may be prescribed by regulations by the Secretary), it is established to the satisfaction of the Secretary that such exchange is not in pursuance of a plan having as one of its principal purposes the avoidance of Federal income taxes.

Sec. 367(a) was amended by sec. 131(a) of the Tax Reform Act of 1984, Pub. L. 98-369, 98 Stat. 662, to eliminate the mandatory ruling requirement and tax-avoidance principal purpose standard. Sec. 367(a) now provides that as a general rule, no gain is recognized if the property is transferred to a foreign corporation for use by such foreign corporation in the active conduct of a trade or business abroad.

[11]Sec. 367(b)(1) provides:

SEC. 367(b). OTHER TRANSFERS.—

(1) EFFECT OF SECTION TO BE DETERMINED UNDER REGULATIONS —In the case of any exchange described in section 332, 351, 354, 355, 356, or 361 in connection with which there is no transfer of property described in subsection (a)(1), a foreign corporation shall be considered to be a corporation except to the extent provided in regulations prescribed by the Secretary which are necessary or appropriate to prevent the avoidance of Federal income taxes.

otherwise be covered by these regulations are covered by the rules applicable generally to transfers out of the United States, namely, that a ruling is required. Sec. 367(d);[12] S. Rept. 94-938, *supra* 1976-3 C.B. (Vol. 3) at 307; H. Rept. 94-658, *supra* 1976-3 C.B. (Vol. 2) at 939.[13] We must decide whether the transitional rule contained in section 367(d) is applicable to the amalgamation of Freedland Ltd. and Huron.

Petitioners initially contend that section 367 is not applicable to the amalgamation. Petitioners assert that section 1036 is applicable, and since it is not one of the sections listed in section 367, a favorable ruling was not required. Section 1036 provides that no gain or loss shall be recognized if common stock in a corporation is exchanged solely for common stock in the same corporation, or if preferred stock in a corporation is exchanged solely for preferred stock in the same corporation. Section 1036 is not limited to an exchange between two individual stockholders; it includes a transaction between a stockholder and the corporation, and it thus overlaps section 368(a)(1)(E) (recapitalization). Sec. 1.1036-1(a), Income Tax Regs. Petitioners assert that section 1036 is applicable, because under Canadian corporate law, no new corporation is created by an amalgamation and the amalgamating companies continue their existence. Petitioners reason, therefore, that the exchange of stock pursuant to a plan of amalgamation is really an exchange of stock for stock in the same corporation.

For their proposition, petitioners rely on *The Queen v. Black & Decker Manufacturing Co.,* [1975] 1 S.C.R. 411, in

---

[12]Sec. 367(d) provides:

SEC. 367(d). TRANSITIONAL RULE.—In the case of any exchange beginning before January 1, 1978—

(1) subsection (a) shall be applied without regard to whether or not there is a transfer of property described in subsection (a)(1), and

(2) subsection (b) shall not apply.

Sec. 367(d) was redesignated as sec. 367(e) by sec. 213(d) of the Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. 97-248, 96 Stat. 465, and was redesignated as sec. 367(f) by sec. 131(c) of the Tax Reform Act of 1984, Pub. L. 98-369, 98 Stat. 664, and was subsequently repealed by sec. 1810(g)(1) of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2828.

[13]Sec. 7.367(b)-1, Temporary Income Tax Regs., through sec. 7.367(b)-12, Temporary Income Tax Regs., 42 Fed. Reg. 65152 (Dec. 30, 1977), were promulgated to govern transfers into the United States and between foreign corporations.

which the Supreme Court of Canada held that whether an amalgamation creates or extinguishes a corporate entity will depend on the terms of the applicable statute, but that upon an amalgamation under the Canada Corporations Act, R.S.C. 1970, ch. C-32, sec. 137, no new company is created and no old company is extinguished. In *Witco Chemical Co., Canada, Ltd. & Corporation of the Town of Oakville, et al.*, [1975] 1 S.C.R. 273, the Supreme Court of Canada held that this result is even clearer when the amalgamation takes place under the provisions of the Business Corporations Act, Ont. Rev. Stat., ch. 53, sec. 197(4) (1970). The Supreme Court of Canada stated that while it may be difficult to comprehend the exact metamorphosis which takes place, it is within the competence of the legislature to provide that what were hitherto two shall continue as one. While two amalgamating corporations may continue as one amalgamated corporation, we do not think it follows that the amalgamating corporations and the amalgamated corporation are the same within the meaning of section 1036. Further, petitioners' expert on Canadian law did not opine that the amalgamating corporations and the amalgamated corporation are the same. Petitioners have failed to convince us that section 1036 is applicable.

Petitioners also contend that a similar situation was considered in Rev. Rul. 64-156, 1964-1 C.B. 139.[14] The ruling dealt with the tax consequences of an exchange of common stock in a foreign corporation solely for common stock in the same foreign corporation, and of an exchange of preferred stock in a foreign corporation solely for preferred stock in the same foreign corporation. Either of the described exchanges may have also qualified as a recapitalization described in section 368(a)(1)(E). The ruling stated that if the recapitalization takes the form of an exchange described in section 1036, no gain will be recognized to the shareholder, notwithstanding the absence of a favorable section 367 ruling since section 1036 is not one of the sections enumerated in section 367. Thus, the underlying premise of the ruling was that the exchanges were

---

[14]Rev. Rul. 64-156, 1964-1 C.B. 139, was declared obsolete by Rev. Rul. 78-381, 1978-2 C.B. 347, because sec. 367(b) as amended by the Tax Reform Act of 1976 does not require a ruling with respect to such an exchange.

recapitalizations under section 368(a)(1)(E) and if they also took the form of an exchange described in section 1036, no ruling was required. A recapitalization is limited to the readjustment of the capital structure of a single corporation. *Role v. Commissioner*, 70 T.C. 341, 349-350 (1978). This was not the case with the amalgamation of Freedland Ltd. and Huron and, consequently, the ruling does not support the argument of petitioners that section 1036 is applicable to the amalgamation.

The amalgamation of Freedland Ltd. and Huron comes within the language of section 367, and further, the legislative history accompanying the Tax Reform Act of 1976 clearly indicates that section 367 was intended to apply to exchanges which exclusively involve foreign parties. The Senate and House reports provide as follows:

With respect to transfers which exclusively involve foreign parties (i.e., where no U.S. persons are parties to the exchange), examples of situations coming within section 367(b)(1) include: (i) the acquisition of stock of a controlled foreign corporation by another foreign corporation; (ii) the acquisition of stock of a controlled foreign corporation by another foreign corporation which is controlled by the same U.S. shareholders as the acquired corporation; (iii) the acquisition of the assets of a controlled foreign corporation by another foreign corporation; (iv) the mere recapitalization of a foreign corporation (type "E" reorganization); and (v) a transfer of property by one controlled foreign corporation to its foreign subsidiary. [S. Rept. 94-938, *supra*, 1976-3 C.B. (Vol 3) at 306-307; H. Rept. 94-658, *supra*, 1976-3 C.B. (Vol. 2) at 938.]

We conclude, therefore, that section 367 is applicable to the amalgamation of Freedland Ltd. and Huron.

Petitioners next contend that if section 367 is applicable to the amalgamation, there was not an exchange pursuant to the amalgamation which began before January 1, 1978, and, therefore, the amalgamation comes within the provisions of section 367(b). Accordingly, no ruling was required and the amalgamation is a tax-free reorganization. Respondent contends that there was an exchange pursuant to the amalgamation which began before January 1, 1978, and, therefore, the transitional rule contained in section 367(d) is applicable. As a result, a ruling was required, and because no ruling was requested, the amalgamation is a taxable transaction to petitioners.

Section 7.367(a)-1(b), Temporary Income Tax Regs., 42 Fed. Reg. 65156 (Dec. 30, 1977)[15] provides that an exchange shall be considered to begin on the earliest date as of which title, possession of, or right to the use of stock, securities, or property passes pursuant to the plan under which the exchange is to be made. Petitioners initially contend that section 7.367(a)-1(b), Temporary Income Tax Regs., is not applicable because the regulation was not approved until December 27, 1977, and was not published in the Cumulative Bulletin until 1978.

Internal Revenue regulations are retroactive in effect unless the Commissioner provides otherwise. Sec. 7805(b); *Automobile Club of Michigan v. Commissioner*, 353 U.S. 180, 184 (1957); *Wilson v. United States*, 588 F.2d 1168, 1171 (6th Cir. 1978). The Commissioner's failure to make a regulation nonretroactive may not be disturbed unless it amounts to an abuse of discretion. *Automobile Club of Michigan v. Commissioner, supra* at 185; *Wilson v. United States, supra* at 1172.

The U.S. Court of Appeals for the Sixth Circuit (the court to which the decisions herein are appealable) in *Wilson v. Commissioner, supra,* has listed several considerations that are relevant in reviewing the Commissioner's exercise of his discretionary power to adopt retroactive regulations. The list includes: (1) Whether or to what extent the taxpayer justifiably relied on settled prior law or policy and whether or to what extent the putatively retroactive regulation alters that law; (2) the extent, if any, to which the prior law or policy has been implicitly approved by Congress, as by legislative reenactment of the pertinent Code provisions; (3) whether retroactivity would advance or frustrate the inter-

---

[15]Sec. 7.367(a)-1(b), Temporary Income Tax Regs., provides:

(b) *Definitions.* Except as otherwise provided, the following definitions apply for purposes of section 367, as amended by section 1042(a) of the Tax Reform Act of 1976—

(1) *Beginning of transfer.* A transfer of property shall be considered to begin on the earliest date as of which title, possession of, or right to the use of stock, securities, or property passes pursuant to the plan under which the exchange is to be made between parties to the exchange. A transfer shall not be considered to begin with a decision of a board of directors or similar action. A transfer shall be deemed to have begun even though it is made subject to a condition that if there is a failure to obtain a determination that there is no tax avoidance purpose, the transaction will not be consummated and to the extent possible the assets transferred will be returned.(2) *Beginning of exchange.* An exchange shall be considered to begin with the beginning of the first transfer of property (within the meaning of paragraph (b)(1) of this section) pursuant to the plan under which the exchange is to be made.

[42 Fed. Reg. 65156 (Dec. 30, 1977).]

est in equality of treatment among similarly situated taxpayers; and (4) whether according retroactive effect would produce an inordinately harsh result.

With respect to the first factor, petitioners do not argue that this is a case of a regulation which was changed after petitioners had relied upon the prior regulation. Sec. 7.367-1, Temporary Income Tax Regs., 42 Fed. Reg. 32286 (June 30, 1977), the predecessor to section 7.367(a)-1, Temporary Income Tax Regs., provides that, "For purposes of section 367(a)(1), a transfer of property made in connection with an exchange shall be considered to begin * * * on the earliest date as of which title, possession of or right to the use of stock, securities, or property passes from one party to the exchange to another party to the exchange." We recognize that the predecessor regulation does not define beginning of exchange but speaks in terms of a "transfer of property made in connection with an exchange." However, if a transfer of property made in connection with the exchange has begun, it follows that the exchange has begun. Consequently, we think that petitioners were sufficiently apprised as to what would constitute the beginning of an exchange as of June 30, 1977. None of the remaining considerations listed above point toward an abuse of discretion in this case. Under the circumstances present here, we conclude that the retroactive application of section 7.367(a)-1(b), Temporary Income Tax Regs., is valid and, therefore, the regulation is applicable.

Petitioners next contend that if section 7.367(a)-1(b), Temporary Income Tax Regs., is applicable, the definition of when an exchange begins is for determining when the 183-day period in section 367(a)(1) begins and not for determining when an exchange begins for purposes of section 367(d). However, the language of the regulation clearly indicates otherwise. Section 7.367(a)-(1)(a)(1)(ii),[16]

---

[16]Sec. 7.367(a)-1(a), Temporary Income Tax Regs., provides:

(a) *Scope.* (1) This section prescribes rules relating to the filing of ruling requests under section 367 of the Internal Revenue Code of 1954. The provisions of this section apply to any exchange to which—

*      *      *      *      *      *      *

(ii) Section 367(a)(1), as amended by section 1042(a) of the Tax Reform Act of 1976 (90 Stat. 1634), applies.

(2) Section 367(a)(1), as amended by section 1042(a) of the Tax Reform Act of 1976, applies in the case of any transfer which begins after October 9, 1975—

Temporary Income Tax Regs., provides that the regulation applies to any exchange to which section 367(a)(1) applies. Section 7.367(a)-1(a)(2)(ii), Temporary Income Tax Regs., provides that section 367(a)(1) applies in the case of any transfer which begins after October 9, 1975, and which is made in connection with an exchange described in section 367(b) if such exchange begins before January 1, 1978. Section 7.367(a)-1(b)(2), Temporary Income Tax Regs., then goes on to define when an exchange begins. Accordingly, section 7.367(a)-1(b), Temporary Income Tax Regs., is applicable in determining when an exchange begins for purposes of deciding whether the amalgamation comes within section 367(d).

Petitioners next contend that in determining when an exchange began we should only examine the exchange of Freedland Ltd. and Huron stock for New Freedland Ltd. stock. We disagree. Section 367(b)(1) speaks in terms of any exchange described in section 332, 351, 354, 355, 356, or 361. The exchange by Freedland and Sherwood of their stock in Freedland Ltd. and Huron for New Freedland Ltd. stock (the shareholder exchange) is an exchange within section 354.[17] The transfer of the property of Freedland Ltd. and Huron to New Freedland Ltd. (the corporate exchange) is an exchange within section 361.[18] Furthermore, the legislative history clearly states that the acquisition of the assets of a controlled foreign corporation by another foreign corporation is one of the situations within the scope of section 367(b). S. Rept. 94-938, *supra*, 1976-3 C.B. (Vol. 3) at 306-307; H. Rept. 94-658, *supra*, 1976-3 C.B. (Vol. 2) at 938. Therefore, we must examine the shareholder exchange

* * * * * * *

(ii) Which is made in connection with an exchange described in section 367(b) (within the meaning of paragraph (b)(4) of this section) if such exchange begins before January 1, 1978.

[17]Sec. 354(a)(1) provides:

SEC. 354(a). GENERAL RULE.—

(1) IN GENERAL.—No gain or loss shall be recognized if stock or securities in a corporation a party to a reorganization are, in pursuance of the plan of reorganization, exchanged solely for stock or securities in such corporation or in another corporation a party to the reorganization.

[18]Sec. 361(a) provides:

(a) GENERAL RULE—No gain or loss shall be recognized if a corporation a party to a reorganization exchanges property, in pursuance of the plan of reorganization, solely for stock or securities in another corporation a party to the reorganization.

and the corporate exchange to determine if there was an exchange beginning before January 1, 1978.

In the instant case, the amalgamation was made pursuant to Canadian law. Therefore, to determine when an exchange began, i.e., when title, possession of, or right to the use of property or stock passed pursuant to the amalgamation, we must look to Canadian law. *Pullman's Palace Car Co. v. Missouri Pacific Railway Co.*, 115 U.S. 587, 594 (1885); *Central Railroad & Banking Co. v. Georgia*, 92 U.S. 665, 670 (1876); see *Gulf Oil Corp. v. Commissioner*, 84 T.C. 447 (1985). We reject the contention of petitioners that we should apply the law of Michigan or look to other Code sections.

Freedland Ltd. and Huron amalgamated pursuant to section 197 of the Business Corporations Act, Ont. Rev. Stat., ch. 53 (1970), as amended (the Ontario Corporations Act).[19] The parties each called as a witness a Canadian attorney who provided a written report and expert testimony on the Canadian law of amalgamations. Donald Matheson testified on behalf of petitioners. He is a partner in the law firm of Miller, Thomson, Sedgewick, Lewis & Healy, and has been engaged in the practice of corporate law with the firm since 1965. He graduated from the Osgoode Hall Law School at Toronto and also has a Master

---

[19]Sec. 197 of the Ontario Corporations Act provides:

(1) Filing of articles of amalgamation.— * * *

(2) Evidence of solvency.— * * *

(3) Issuance of certificate of amalgamation.—If the articles of amalgamation conform to law, the Minister shall, when all prescribed fees have been paid,

(a) endorse on each duplicate of the articles the word "Filed" and the day, month and year of the filing thereof;

(b) file one of the duplicates in his office; and

(c) issue to the amalgamated corporation or its agent a certificate of amalgamation to which he shall affix the other duplicate.

(4) Effect of certificate.—Upon the date set forth in the certificate of amalgamation,

(a) the amalgamation becomes effective and the amalgamating corporations are amalgamated and continue as one corporation under the terms and conditions prescribed in the amalgamation agreement;

(b) The amalgamated corporation possesses all the property, rights, privileges and franchises and is subject to all liabilities, contracts, disabilities and debts of each of the amalgamating corporations;

(c) the issued capital of the amalgamated corporation is, subject to the decrease provided for in subsection (3) of section 196, equal to the aggregate of the issued capital of each of the amalgamating corporations immediately before the amalgamation becomes effective; and

(d) the articles of incorporation of each of the amalgamating corporations are amended to the extent necessary to give effect to the terms and conditions of the amalgamation agreement.

of Laws from Boalt Hall Law School of the University of California. He has served as an instructor in corporate law in the bar admission course of the Law Society of Upper Canada and has participated in continuing legal education programs on corporate law conducted by the Law Society of Upper Canada and the Ontario Branch of the Canadian Bar Association. Since 1982, he has been a member of the Ontario Business Corporations Act Advisory Committee of the Ontario Branch of the Canadian Bar Association. In the course of his practice, he has frequently amalgamated companies for clients.

In his written report, Matheson did not address the issue of when was the earliest date title, possession of, or right to the use of stock or property passed pursuant to the amalgamation. He concluded his report as follows:

it is my opinion that under Ontario Law, a certificate of amalgamation is not necessarily conclusive for all purposes that the amalgamation took place on the date specified in the certificate. If it can be established that the certificate of amalgamation was actually issued at a later date, then it may be shown that the amalgamation was not effective for purposes outside the Act until the certificate of amalgamation was actually issued. In my opinion, the wording of section 197(4) of the Act does not make it clear that for all purposes, whether in connection with the Act or otherwise, the amalgamation is considered to have been effective on the date set out in the certificate of amalgamation.

At trial, Matheson was asked on direct examination when the exchange of stock began. His response was that the amalgamation could not occur until the certificate of amalgamation was issued on March 10, 1978. Based upon his response, we assume that in his opinion, the exchange of stock could not begin until March 10, 1978. Matheson also testified that in an amalgamation there was no conveyance or delivery of property from the amalgamating corporations to the amalgamated corporation. However, on cross-examination, Matheson testified that the possession of property passes according to the statute, for purposes of the statute, on the date set forth in the certificate of amalgamation, which in this case is December 31, 1977. He also testified on cross-examination that although the passing is deemed to take place on the date of the certificate of amalgamation, December 31, 1977, in his opinion, it could

not have taken place until such time as the certificate of amalgamation was issued on March 10, 1978.

Warren Grover testified on behalf of respondent. He is a partner in the law firm of Blake, Cassels & Graydon, and has been engaged in the practice of corporate law with the firm since 1963, with the exception of the period July 1, 1969, to July 1, 1977, when he was a professor of law at Osgoode Hall Law School of York University, which is located in Toronto. His practice is now, and has been since its inception, restricted to corporate law, particularly with major Canadian corporations. As a professor of law he taught business associations, income tax, corporate finance, and securities regulation, which are the core courses in corporate law. With Donald Ross, he is the author of a text entitled "Materials on Corporate Finance," which includes a section on amalgamations and, with Frank Iacobucci, he is the editor of six successive editions of "Materials on Canadian Income Tax" which is the basic tax casebook used in the law schools in Canada and which includes a section on amalgamations. In his practice, he has frequently amalgamated companies for clients. The most recent major amalgamation in which he has been involved is the amalgamation of the Mercantile Bank of Canada with the National Bank of Canada, which was completed in February 1986.

With respect to the shares of the amalgamating corporations, the written report of Grover states the following:

In the recent case of *Re Koch Transport* (1982), 135 D.L.R. (3d) 695, the Ontario Court held that shares of amalgamating companies are not issued or transferred on amalgamation, they are converted. But title to those converted shares then resides in the former shareholders of the amalgamating corporations, as of the date set forth in the certificate.

At trial, Grover testified that the stock of the amalgamating corporations converted into the stock of the amalgamated corporation, and that title of the stock passed on December 31, 1977. He explained that stock meant the share of a corporation, as opposed to a share certificate which is an indicium of title to the share. He testified that the issuance of a share certificate was not relevant in determining when title passed pursuant to the amalgam-

ation. Matheson, on the other hand, did not draw a distinction between stock and a stock or share certificate.

Section 7.367(a)-1(b), Temporary Income Tax Regs., uses the term "stock." Stock is "the incorporeal property which is represented by the holding of a certificate of stock * * * 'Stock' in a corporation is an equity, and it represents an ownership interest." Black's Law Dictionary 1269 (5th ed. 1979). A certificate of stock is "merely written evidence of ownership of stock, and of the rights and liabilities resulting from such ownership. It is merely a paper representation of an incorporeal right, and stands on the footing similar to that of other muniments of title." Black's Law Dictionary 206 (5th ed. 1979). Therefore, we conclude that in determining when title to the stock passed for purposes of the regulation we should examine when the ownership interest passed and not when the certificate representing such ownership passed.

The written report of Grover concludes that it would be the law of Ontario that the transfer of property to the amalgamated corporation, New Freedland Ltd., occurred on December 31, 1977, as specifically stated in section 197(4) of the Ontario Corporations Act. Grover also testified that in his view it is unquestioned that possession of and the right to use the property of the amalgamating corporations passed at the effective date of the amalgamation, December 31, 1977, because of the impact of section 197(4)(b) of the Ontario Corporations Act, which provides that upon the date set forth in the certificate of amalgamation, the amalgamated corporation possesses all of the property of each of the amalgamating corporations.

We find Grover's written report and testimony to be clearer and to the point. We conclude, therefore, based upon the written report and testimony of Grover that pursuant to the plan of amalgamation, title to the stock of New Freedland Ltd. passed to Freedland and Sherwood on December 31, 1977. We further conclude that pursuant to the plan of amalgamation, the possession of and the right to the use of the property of Freedland Ltd. and Huron passed to New Freedland Ltd. on December 31, 1977. Accordingly, there was an exchange pursuant to the amalgamation which began before January 1, 1978; therefore,

the transitional rule contained in section 367(d) is applicable and a ruling was required.

Petitioners contend that if we conclude that there was an exchange which began before January 1, 1978, we are, in effect, taxing an executory transaction. Petitioners argue that section 367(d) which focuses on the beginning of the exchange is inconsistent with other provisions of the Code which espouse the general proposition that taxation results when transactions are substantially completed. We simply point out that section 367(d) is a transitional rule. Section 367(d) provides that in the case of any exchange under section 367(b) which begins before January 1, 1978, section 367(a) is applicable. We must focus, therefore, on when an exchange began to determine whether section 367(a) or section 367(b) is applicable. Our conclusion will determine which section is applicable but it will not result in the taxation of an executory transaction or in inconsistency with other Code provisions.

Petitioners next contend that if we conclude that there was an exchange which began before January 1, 1978, a ruling was not required because the amalgamation did not have a tax-avoidance purpose and the revenues of the United States were not impaired. Petitioners contend that we must examine all the facts and circumstances to decide whether the amalgamation had a tax avoidance purpose. For their proposition petitioners cite *Gerli & Co. v. Commissioner*, 668 F.2d 691 (2d Cir. 1982), revg. 73 T.C. 1019 (1980); *Kaiser Aluminum & Chemical Corp. v. Commissioner*, 76 T.C. 325 (1981); *Hershey Foods Corp. v. Commissioner*, 76 T.C. 312 (1981); *Dittler Bros., Inc. v. Commissioner*, 72 T.C. 896 (1979), affd. without published opinion 642 F.2d 1211 (5th Cir. 1981). Petitioners' reliance is misplaced.

In *Gerli & Co. v. Commissioner, supra*, the taxpayer requested a ruling that the liquidation of a foreign subsidiary under section 332 did not have as one of its principal purposes the avoidance of Federal income taxes. The Commissioner issued a favorable ruling upon the condition that the taxpayer include in income as a dividend in the year of liquidation the accumulated and current earnings and profits of the foreign subsidiary. The taxpayer liqui-

dated the subsidiary but did not include any amount in income with respect to the earnings and profits of the subsidiary. We held that since the taxpayer chose not to abide by the condition of the ruling, the liquidation did not qualify under section 332. The U.S. Court of Appeals for the Second Circuit reversed, holding that the imposition of the condition was not a reasonable or acceptable substitute for compliance with the Commissioner's responsibility under section 367 to determine whether one of the principal purposes of the liquidation was the avoidance of Federal income taxes.[20] The case is factually distinguishable from the instant case in that a ruling was requested. *Gerli & Co. v. Commissioner, supra*, does not stand for the proposition that if a ruling is not requested we must examine all the facts and circumstances and determine if there is any potential for the avoidance of Federal income taxes.

The remaining cases relied on by petitioners, *Kaiser Aluminum & Chemical Corp. v. Commissioner, supra, Hershey Foods Corp. v. Commissioner, supra*, and *Dittler Bros., Inc. v. Commissioner, supra*, were declaratory judgment actions under section 7477. Section 7477[21] generally provides that in the case of an actual controversy involving a determination by the Commissioner that a plan has as one of its principal purposes the avoidance of Federal income taxes, the taxpayer may seek a judicial determination, in the form of a declaratory judgement, in this Court, and we are to review whether the Commissioner's determination is reasonable. Therefore, in each of these cases, we were reviewing the Commissioner's unfavorable ruling. In none of these cases did the taxpayer fail to request a ruling from the Commissioner. Petitioners have not brought to our attention any case where a ruling was not requested, and

---

[20]We need not decide whether we will follow the approach of the Second Circuit. The instant case is not appealable to the Second Circuit and, therefore, we are not bound by our opinion in *Golsen v. Commissioner*, 54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971), cert. denied 404 U.S. 940 (1971).

[21]Sec. 7477 was enacted by sec. 1042(d)(1) of the Tax Reform Act of 1976, Pub. L. 94-455, 90 Stat. 1637. Prior to its enactment, "there * * * [was] no effective way a taxpayer [could] * * * appeal an adverse decision by the Commissioner to the courts because the statute require[d] the Commissioner's, not the court's, satisfaction." S. Rept. 94-938 (1976), 1976-3 C.B. (Vol. 3) 49, 299; H. Rept. 94-658 (1975), 1976-3 C.B. (Vol. 2) 695, 932. Sec. 7477 was repealed by sec. 131(e)(1) of the Tax Reform Act of 1984, Pub. L. 98-369, 98 Stat. 664, applicable to transfers or exchanges after Dec. 31, 1984, in tax years ending after such date, in conjunction with the elimination of the ruling requirement in sec. 367(a) (see note 10 *supra*).

we reviewed the transaction to determine if one of its principal purposes was the avoidance of Federal income taxes. In fact, we have previously rejected such an approach. *Texas-Canadian Oil Corp., Ltd. v. Commissioner*, 44 B.T.A. 913 (1941).

Petitioners next contend that if they had requested a ruling they would have received a favorable ruling under Revenue Procedure 68-23, 1968-1 C.B. 821, and there would have been no immediate tax under Revenue Procedure 75-29, 1975-1 C.B. 754. While this may be true, the fact remains that a ruling was not requested as required by the statute. Furthermore, to decide whether a favorable ruling would have been issued we must in effect, examine the transaction to determine if one of its principal purposes was the avoidance of Federal income taxes. We have concluded above that we will not do so.

Petitioners next contend that the legislative history indicates that congressional intent was not to impose an immediate U.S. tax liability on transfers which exclusively involve foreign parties. See S. Rept. 94-938, 1976-3 C.B. *supra*, at 306-307; H. Rept. 94-658, *supra*, at 938. Petitioners, however, ignore the operation of the transitional rule contained in section 367(d). Section 367(d) provides that in the case of any exchange under section 367(b) which begins before January 1, 1978, section 367(a) is applicable and as a result, a ruling is required. Transitional rules and effective dates are the mandate of Congress and we are of course bound to apply the law as written. *Donigan v. Commissioner*, 68 T.C. 632, 636 (1977).

As a result of petitioners' failure to request a ruling, the Commissioner determined that the exchange of the stock of petitioners in Freedland Ltd. and Huron for stock of New Freedland Ltd. was taxable under section 1248. Petitioners contend, however, that section 1248 and section 367(a) are inconsistent. Section 1248(a) generally provides that if a U.S. person sells or exchanges stock in a foreign corporation and such person owns 10 percent or more of the voting stock at any time during the prior 5 years when the foreign corporation was a controlled foreign corporation, then the gain recognized on the sale or exchange shall be treated as a dividend to the extent of the earnings and profits of the

foreign corporation which were accumulated during the period the stock was held while the foreign corporation was a controlled foreign corporation. Petitioners argue that if Freedland Ltd. and Huron are not corporations for purposes of section 367, then they are not corporations for purposes of section 1248. Petitioners then conclude that if Freedland Ltd. and Huron are not corporations there can be no exchange of stock under section 1248, and that the transaction should be viewed as a combination of two unincorporated businesses, which would not be taxable.

Section 367(a) generally provides that in connection with any exchange described in section 332, 351, 354, 355, 356, or 361, a foreign corporation shall not be considered a corporation absent a favorable ruling. Under the sections listed, the corporate status of the foreign corporation is essential to tax-free treatment. The statutory framework provides, in essence, that absent a favorable ruling under section 367(a)(1), tax-free treatment will not be accorded to an exchange described in the sections enumerated in section 367(a)(1). This is accomplished by denying corporate status to the foreign corporation. However, the statutory framework does not provide that if a foreign corporation is not a corporation under section 367(a)(1), it is not a corporation for all purposes. In fact, in the 1932 Senate Finance Committee report,[22] we are told that "For all other purposes [i.e., for purposes of sections other than those described in sec. 367], * * * the tax status of a foreign corporation is not affected by the new subsection." S. Rept. 665, 72d Cong., 1st Sess. (1932), 1939-1 C.B. (Part 2) 496, 515. If a U.S. person exchanges stock in a foreign corporation and it is an exchange described in one of the sections enumerated in section 367(a)(1), and tax-free treatment is not accorded by virtue of the failure to obtain a favorable ruling, it is a taxable exchange of the stock. Section 1248 then characterizes the recognized gain as ordinary income to the extent defined therein. We find no inconsistency between sections 1248 and 367(a).

In sum, we conclude that there was an exchange pursuant to the amalgamation which began before January 1, 1978,

---

[22]Sec. 367 was originally enacted as sec. 112(k) of the Revenue Act of 1932, Pub. L. 154, 47 Stat. 198.

and, therefore, the transitional rule contained in section 367(d) was applicable. Accordingly, a ruling was required under section 367(a) that the amalgamation was not in pursuance of a plan having as one of its principal purposes the avoidance of Federal income taxes. Inasmuch as a ruling was not requested, the exchange of the stock of petitioners in Freedland Ltd. and Huron for stock of New Freedland Ltd. is taxable. Because the exchange comes within section 1248, the gain is taxable as a dividend to the extent defined therein.

To reflect the foregoing,

*Decisions will be entered under Rule 155.*[23]

---

[23]Although respondent has prevailed on all of the issues, there is an issue of intercompany pricing that is being litigated in Canada. The resolution may affect petitioners' taxable income for the taxable years in issue. Accordingly, the parties have requested that we enter decisions under Rule 155.